IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CAMERON INTERNATIONAL CORPORATION, | § § § | |
| Plaintiff, | § | |
| v. | § § | Cause No. _____ |
| STEVEN ABBISS AND FMC TECHNOLOGIES SINGAPORE PTE LTD, | § § § § | |
| Defendants. | § § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff Cameron International Corporation ("Cameron" or "Plaintiff") files this Original Complaint against Defendants Steven Abbiss ("Abbiss") and FMC Technologies Singapore Pte Ltd ("FMC").

## I.
## INTRODUCTION

1.      This is a breach of non-compete agreement case.  In June 2016, Abbiss, a 25-year key employee of Cameron, was hired by FMC, a direct competitor of Cameron, as its General Manager for the Middle East. Abbiss's employment with FMC is in violation of three non-compete agreements executed by Abbiss in exchange for substantial awards of Cameron stock and access to confidential information of Cameron.

## II.
## PARTIES

2.      Plaintiff, Cameron International Corporation, is a corporation that is organized under the laws of the State of Delaware with its principal place of business in Houston, Texas.

3. On information and belief, Defendant, Steven Abbiss, is a citizen of the United Kingdom who is domiciled in the United Arab Emirates. This Defendant may be served with summons by serving him at his home address of PO Box 30, Postal Code 124, Villa 1593, Way 4831, Azaibah, Muscat 12400, Oman, or wherever he may be found, pursuant to Rule 4(f) of the Federal Rules of Civil Procedure.

4. Defendant, FMC, is a Singapore private limited company. This Defendant may be served with summons by serving it at its principal place of business at 149 Gul Circle, Singapore 629605, pursuant to Rules 4(f) and 4(h)(2) of the Federal Rules of Civil Procedure.

### III.
### JURISDICTION AND VENUE

5. This is a breach of contract action over which this Court has diversity jurisdiction, pursuant to 28 U.S.C. § 1332 by virtue of the parties' complete diversity of citizenship and the amount in controversy that is in excess of $75,000.00, exclusive of interest and cost. Cameron is a Delaware corporation with its principal place of business in Houston, Texas. Abbiss is a citizen of the United Kingdom who is domiciled in the United Arab Emirates, and FMC Singapore is a Singapore private limited company.

6. The Court has personal jurisdiction over Abbiss because Abbiss agreed to the "**exclusive** **venue and jurisdiction**" in the state or federal courts in Harris County, Texas, in the non-compete agreements at issue.

7. The Court has general jurisdiction over FMC Singapore because FMC Singapore maintains continuous and systematic contacts in Harris County, Texas. FMC regularly solicits business and contracts in Texas at, among other things, the Offshore Technology Conference held annually in Houston.

8.      Venue is proper in the Southern District of Texas under 28 U.S.C. § 1391(b)(3) because Defendant Abbiss is subject to the Court's personal jurisdiction with respect to this action under the non-compete agreements' mandatory forum selection clause.

## IV.
## CONDITIONS PRECEDENT

9.      All conditions precedent to filing this lawsuit has been met.

## V.
## FACTS

**A.      CAMERON AND FMC ARE DIRECT COMPETITORS IN THE MIDDLE EAST.**

10.     Cameron is a world-wide leading provider of flow equipment products, systems, and services to oil, gas, and process industries. Leveraging its global manufacturing, engineering, and sales and service network, Cameron works with drilling contractors, oil & gas producers, pipeline operators, refiners, and other process owners to control, direct, adjust, process, measure, and compress pressures and flows.

11.     Abbiss worked for Surface Systems, a group within Cameron.

12.     The Surface Systems group provides wellhead and valve products, systems, and services used in surface oil and gas drilling and production. The group is an integral part of Cameron's flow equipment leadership in oil, gas, and other process markets. The Surface Systems group is the largest provider of surface production equipment in the industry. Cameron offers to its customer's comprehensive operation solutions, flow control products, services, and technologies.

13.     Cameron is active in the Middle East, providing surface systems solutions to clients across a variety of countries, including: Oman, Yemen, Saudi Arabia, Qatar, United Arab Emirates, Kuwait, and Iraq.

3

14. FMC is a direct competitor of Cameron throughout the world, including the Middle East.

15. In June of 2016, FMC hired Abbiss, a key 25-year employee of Cameron. FMC hired Abbiss as its General Manager in the Middle East.

16. Abbiss most recently served as the District Manager for Cameron in Oman. In this position, Abbiss had access to, and has knowledge of, confidential information and trade secrets of Cameron relating to its entire Middle East operations, customers, competitive bidding strategy, financials information, and technology under development that is to be rolled-out in the Middle East.

17. FMC is a leading competitor of Cameron in the Middle East; Abbiss is being assigned to a position with FMC in which he has intimate knowledge of the trade secrets and business strategies of Cameron. As such, there is an imminent risk of harm to Cameron that Abbiss, in his position at FMC, will use and disclose Cameron's trade secrets, causing irreparable harm to Cameron.

**B. FMC STANDS TO GAIN AN UNFAIR COMPETITIVE ADVANTAGE BY ACCESSING CAMERON'S CONFIDENTIAL INFORMATION AND TRADE SECRETS THROUGH ABBISS.**

18. FMC regularly competes with Cameron for business and projects throughout the Middle East. Many of those projects are awarded based on a competitive bidding process (called tenders).

19. Abbiss has confidential information as to margins and costs in many of the Middle East countries to which he has been appointed General Manager for FMC (which can readily be used to undercut Cameron's bid prices), as well as knowledge of Cameron's bidding and market strategy in the Middle East.

4

20.     Compounding this immediate threat to Cameron is that in recent months, FMC has suffered market share losses to Cameron. FMC is actively seeking to recoup its losses in the Middle East and to expand its market share and operations in the region.

21.     Hiring Abbiss, who has intimate knowledge of Cameron's bidding strategies, margins/costs, and competitive strategy, gives FMC an unfair advantage in seeking to take business away from Cameron.

22.     As to business that is awarded without competitive bidding in the Middle East, Abbiss has knowledge of where Cameron has secured those opportunities and how it was successful, as well as potential opportunities for non-bid work and how Cameron is pursuing those opportunities.

23.     Cameron devotes substantial resources, including millions of dollars and thousands of man hours, towards developing new products, services, and technology offerings for its customers, as well as business and sales strategies to effectively compete in the Middle East. This information is kept confidential by Cameron and is considered trade secret by Cameron. This information is not shared outside the company.

24.     Abbiss, because of his position of management and leadership in Cameron, and tenure with Cameron, is intimately familiar with this confidential information.

25.     If this information were obtained by a competitor of Cameron, such as FMC, Cameron stands to lose a substantial competitive advantage and market share in the Middle East, as its competitor would be able to reap the benefits of Cameron's industry-leading products, services, technologies, and strategies by diverting business away from Cameron without expending any of the corresponding costs and man-hours of development.

### C. CAMERON HAS INVESTED SUBSTANTIAL RESOURCES IN TRAINING ABBISS, WHO HAS BEEN PROVIDED WITH CAMERON CONFIDENTIAL INFORMATION.

26. Cameron has invested substantial time and money in providing specialized training to Abbiss.

27. Abbiss first started with Cameron twenty-five (25) years ago in approximately September 1990, with little- to-no industry experience.

28. Abbiss recently resigned from his employment at Cameron effective May 31, 2016, to join FMC.

29. As previously mentioned, at the time of his resignation, Abbiss was a highly valued employee of Cameron. Abbiss, based upon his 25 years of employment with Cameron and the various positions of management and leadership he held with the company in the Middle East and Asia, had access to, and knowledge of, highly confidential information of Cameron.

30. During his 25 years of employment at Cameron, Abbiss worked his way up from customer service representative in Leeds, United Kingdom (in the company's subsea division) to a position as a bidding coordinator in that same division. From 1997 to 2005, Abbiss worked as a sale representative and then Territory Sales Manager in the Middle East. Then, in December 2005, Abbiss was promoted to District Sales Manager for South & Southeast Asia. In June 2010, he was promoted to Regional Manager, Asia.

31. In January 2015, Abbiss was transferred back to the Middle East where he served as District Manager in Oman. Although the title of District Manager of Oman may seem less than that of his previous position, based upon the volume of business Cameron conducts in Oman, the transfer was viewed as a promotion and an increase in duties and responsibilities.

32. For the next one-and-a-half years until his resignation, Abbiss was intimately involved in managing and implementing Cameron's business strategies in Oman. Because of the

6

inter-relatedness of the industry and business in the Middle East, Abbiss also had extensive knowledge of confidential information related to Cameron's business operations and customers throughout the Middle East, including Saudi Arabia, Qatar, United Arab Emirates, Kuwait, and Iraq.

33. Most customers in the Middle East bid out their projects to oil and gas service companies through a competitive tender process. Competitive pricing and product offerings are critical to obtaining work in the Middle East.

34. Cameron devotes substantial resources to performing market research to identify how to respond to prospective tenders and address customer needs, as well as in developing new cost-effective technologies and methodologies to provide competitive solutions to identified needs. As a result of Cameron's hard work to bid competitively in the Middle East, Cameron has the largest market share in most of the Middle Eastern countries it does business.

35. In connection with his work for Cameron, Abbiss has intimate knowledge of the projects Cameron was bidding on, the after-market margin on key bids, Cameron's bidding strategies, as well as Cameron's confidential technical and non-technical data, financial data, customer preferences, pricing information, cost information, margins, and business strategies.

36. For example, in February 2016, Abbiss attended a multi-day conference for Cameron held in Singapore. During this conference, Abbiss was provided detailed updates on Cameron's business strategies worldwide, but most particularly in the Middle East. Abbiss was briefed extensively on Cameron's strategies to maintain and expand its business in the Middle East, which included specific and detailed briefing as to Cameron's business activities and prospects for many of the countries for which Abbiss is now General Manager for FMC. For each of those countries, Abbiss was provided information as to Cameron's bookings, customer

revenue, current and historic after-market margins (for countries across the Middle East), 2015 financials, and the specific actions and strategies that are going to be undertaken by Cameron in 2016-2017 in a number of those countries to maintain and gain business. For those countries, Abbiss was provided extensive briefing on the revenue, margins, and utilization rates Cameron achieved. This information alone is highly confidential information which, now in the hands of FMC, enables FMC to undercut Cameron in future bids.

37. Abbiss also received extensive briefing (as to many of the countries in which he is the General Manager for FMC) as to specific revenue opportunities Cameron perceives in those countries over the course of the next year and the specific strategies Cameron seeks to employ to obtain the work. Cameron identified the potential customers from which Cameron believed it could obtain additional opportunities, the resources Cameron was devoting to obtain those opportunities, and Cameron's assessment of the risks and concerns related to pursing those business opportunities. Again, armed with this information, FMC will have an unfair advantage in usurping those opportunities from Cameron.

38. During the presentations, Abbiss also was made knowledgeable of Cameron's research into competitor activity in the Middle East, including research on FMC's activity. If Abbiss were to disclose this information to FMC, it would provide FMC with a clear picture of Cameron's understanding of FMC's business that FMC could use to shift resources to areas of FMC's business that Cameron is not intending to compete as heavily against or where, based upon the confidential information Abbiss had access to, where Cameron is most vulnerable.

39. Abbiss was also given a presentation on Cameron's strategy for competing in the down oil market and new market penetration strategies based on developing unconventional plays in the Middle East.

40.     Further, Abbiss was briefed on new technology (which has not been market released) for developing unconventional plays, including synergies to be realized in this market based on Cameron's recent merger with Schlumberger. During this meeting, Abbiss was briefed extensively on new flow control product offerings being developed by Cameron for initial roll-out in Saudi Arabia and Kuwait. Armed with this knowledge, Abbiss—as General Manager for FMC in the Middle East—may very well take steps, or implement strategies to undermine Cameron's ability to take advantage of these unconventional plays.

41.     During the presentations, Abbiss was also extensively briefed on areas where Cameron may be vulnerable, including product failings or other customer satisfaction issues. This information is generally not known to Cameron's competitors.

42.     Now that Abbiss is the General Manager for FMC in the Middle East, Abbiss is in a position where he can use his knowledge of where Cameron is most vulnerable to usurp business opportunities and client relationships from Cameron to FMC.

43.     These presentations, in addition to the day-to-day access that Abbiss had to the trade secrets of Cameron, effectively give Abbiss (and now FMC) a roadmap for Cameron's strategy in the Middle East for maintaining and gaining market share in the evolving oil economy, as well as Cameron's margins for use in upcoming tenders.

44.     If Abbiss were to use or share this information with FMC, which it is inevitable that he will do so as the General Manager of FMC in the Middle East, it will enable FMC to undercut Cameron's pricing on upcoming tenders, usurp business and opportunities away from Cameron, and/or enable FMC to alter its strategy to focus on markets where Cameron is not priced as competitively.

45. FMC could also alter its product, service, or technology offerings to match Cameron's confidential custom packages designed to meet needs for upcoming tenders. In short, FMC stands to gain substantial business opportunities and market share from Cameron across a variety of Middle Eastern countries.

46. As mentioned, Abbiss also had frequent (if not daily) access to and knowledge of Cameron trade secrets. Abbiss would routinely receive monthly updates on Cameron's Middle Eastern operations across multiple markets, including many of the countries for which he is the General Manager for FMC. In these monthly updates, upcoming projects and tenders were discussed, as well as Cameron's market analyses and competitor research, including research into FMC's activities in each country.

47. Abbiss also spoke regularly with, and developed a rapport with, various Cameron country managers across the Middle East.

48. Shortly before leaving Cameron, Abbiss was integrally involved in developing Cameron's strategies for gaining market share in Oman, and discussing Cameron's competitve strategy across other markets in the Middle East. Thus, Abbiss was intimately aware of recent developments and opportunities in the Middle East market for Cameron.

**D. CAMERON SOUGHT TO PROTECT ITS INFORMATION BY, AMONG OTHER THINGS, ENTERING INTO NON-COMPETE AND NON-DISCLOSURE AGREEMENTS WITH ABBISS.**

49. Cameron takes substantial steps to protect its confidential information entrusted to its employees,[1] including by, among other things, entering into non-compete and non-disclosure agreements with key employees—like Abbiss—to limit the disclosure and use of Cameron's confidential information to Cameron's business.

---

[1] For example, Cameron has adopted confidentiality and nondisclosure policies; required password protection on its computers and electronic information network systems; limited the use of external devices; and limited access to information on a "need-to-know" basis.

50. To this end, Cameron entered into three agreements with Abbiss that contained confidentiality, non-disclosure, and non-compete obligations. These agreements were the annual Restricted Stock Unit Award Agreements awarded to Abbiss in January 2014, January 2015, and January 2016 (collectively, "Non-Compete Agreements").

51. On or around January 1, 2014, Abbiss entered into a Restricted Stock Unit Award Agreement with Cameron (the "2014 RSU"). *The 2014 RSU is attached as* **Exhibit A**.

52. Under the terms of the 2014 RSU, Cameron granted Abbiss substantial shares of stock in exchange for Abbiss's execution of non-compete, non-solicit, and non-disclosure agreements.

53. In Paragraph 9(a) of the 2014 RSU, Abbiss acknowledged and agreed that:

> The Participant acknowledges that the Participant is in possession of and has access to confidential information, including material relating to the business, products and/or services of the Company or Employer and that he or she will continue to have such possession and access during employment by the Company or Employer. The Participant also acknowledges that the Company's (or Employer's) business, products and services are highly specialized and that it is essential that they be protected, and, accordingly, the Participant agrees that as partial consideration for the Award granted herein that should the Participant engage in any "Detrimental Activity," as defined below, at any time during his or her employment or during a period of one year following his or her termination the Company or Employer shall be entitled to: (i) recover from the Participant the value of any portion of the Award that has been paid; (ii) seek injunctive relief against the Participant; (iii) recover all damages, court costs, and attorneys' fees incurred by the Company or Employer in enforcing the provisions of this Award, and (iv) set-off any such sums to which the Company or Employer is entitled hereunder against any sum which may be owed the Participant by the Company or Employer.

(*2014 RSU* at ¶ 9(a)). "Detrimental Activity" includes, among other things:

> (i) rendering of services for any person or organization, or engaging directly or indirectly in any business, which is or becomes competitive with the Company or any Subsidiary; (ii) disclosing to anyone outside the Company, or any Subsidiary or using in other than the Company's or any Subsidiary's business, without prior written authorization from the Company or any Subsidiary, any confidential information including material relating to the business, products or services of the Company or any Subsidiary acquired by the Participant during employment with the Company or any Subsidiary; (iii) soliciting, interfering, inducing, or attempting to cause any employee of the Company or any Subsidiary to leave his or her employment, whether

11

done on Participant's own account or on account of any person, organization or business which is or becomes competitive with the Company or any Subsidiary, or (iv) directly or indirectly soliciting the trade or business of any customer of the Company or any Subsidiary.

(*2014 RSU* at ¶ 9(b)).

54. To date, Abbiss has received in excess of 302 shares of Cameron stock for executing the 2014 RSU.

55. On or around January 1, 2015, Abbiss executed a Restricted Stock Unit Award Agreement with Cameron (the "2015 RSU"). *The 2015 RSU is attached to the Tobias Decl. as Exhibit B*.

56. Under the terms of the 2015 RSU, Cameron granted Abbiss further substantial shares of stock in exchange for Abbiss's execution of a non-compete, non-solicit, and non-disclosure agreement.

57. In Paragraph 9(a) of the 2015 RSU, Abbiss acknowledged and agreed that:

The Participant [Abbiss] acknowledge that the Participant is in possession of and has access to confidential information, including material related to the business, products and/or services of the Company or Employer [Cameron] and that he ors he will continue to have such possession and access during employment by the Company or Employer. The Participant also acknowledges that the Company's or Employer's business, products and services are highly specialized and that it is essential that they be protected, and, accordingly, **the Participant agrees that as partial consideration for the Award granted herein that should the Participant engage in any "Detrimental Activity," as defined below, at any time during his or her employment or during a period of one year following his or her termination the Company or Employer shall be entitled to: (i) recover from the Participant the value of any portion of the Award that has been paid; (ii) seek injunctive relief against the Participant pursuant to the provisions of subsection (c) below; (iii) recover all damages, court costs, and attorneys' fees incurred by the Company or Employer in enforcing the provisions of this Award, and (iv) set-off any such sums to which the Company or Employer is entitled hereunder against any sum which may be owed the Participant by the Company or Employer.**

(*2015 RSU* at ¶ 9(a) (emphasis in original)).

58. "Detrimental Activity" was defined the same as the 2014 RSU, and included competing against Cameron or using or disclosing Cameron's confidential information (*2015 RSU* at ¶ 9(b)).

59. To date, Abbiss has received in excess of 360 shares of Cameron stock for executing the 2015 RSU.

60. On or around January 1, 2016, Abbiss executed a third Restricted Stock Unit Award Agreement with Cameron (the "2016 RSU"). *The 2016 RSU is attached to the Tobias Decl. as* **Exhibit C**.

61. Under the terms of the 2016 RSU, Cameron granted Abbiss additional shares of stock in exchange for Abbiss's execution of an identical non-compete, non-solicit, and non-disclosure agreement as he had executed in 2015 (*2016 RSU* at ¶ 8(a-b)).

62. In Paragraphs 8(a-b) of the 2016 RSU, Abbiss acknowledged and agreed that:

(a) The Participant acknowledges that the Participant is in possession of and has access to confidential information, including material relating to the business, products and/or services of the Company or Employer and that he or she will continue to have such possession and access during employment by the Company or Employer. The Participant also acknowledges that the Company's or Employer's business, products and services are highly specialized and that it is essential that they be protected, and, accordingly, **the Participant agrees that as partial consideration for the Award granted herein that should the Participant engage in any "Detrimental Activity," as defined below, at any time during his or her employment or during a period of one year following his or her termination the Company or Employer shall be entitled to: (i) recover from the Participant the value of any portion of the Award that has been paid; (ii) seek injunctive relief against the Participant pursuant to the provisions of subsection (c) below; (iii) recover all damages, court costs, and attorneys' fees incurred by the Company or Employer in enforcing the provisions of this Award, and (iv) set-off any such sums to which the Company or Employer is entitled hereunder against any sum which may be owed the Participant by the Company or Employer.**

(b) "Detrimental Activity" for the purposes hereof, other than with respect to involuntary termination by the Company or Employer without Cause, shall include: (i) rendering of services for any person or organization, or engaging

13

directly or indirectly in any business, which is or becomes competitive with the Company or Employer; (ii) disclosing to anyone outside the Company or Employer, or using in other than the Company's or Employer's business, without prior written authorization from the Company or Employer, any confidential information including material relating to the business, products or services of the Company or Employer acquired by the Participant during employment with the Company or Employer; (iii) soliciting, interfering, inducing, or attempting to cause any employee of the Company or Employer to leave his or her employment, whether done on Participant's own account or on account of any person, organization or business which is or becomes competitive with the Company or Employer, or (iv) directly or indirectly soliciting the trade or business of any customer of the Company or Employer. "Detrimental Activity" for the purposes hereof with respect to involuntary termination by the Company or Employer without Cause shall include only part (ii) of the preceding sentence.

63. To date, Abbiss has received in excess of 317 shares of Cameron stock worth in excess of $20,000.00 for executing the 2016 RSU.

64. In the Non-Compete Agreements, Abbiss further acknowledged and agreed that in the event Abbiss violated the Non-Compete Agreements, Cameron shall be entitled to: (i) recover from Abbiss the value of any portion of the stock award that has been paid; (ii) seek injunctive relief against Abbiss; and (iii) recover all damages, court costs, and attorneys' fees incurred by Cameron in enforcing the provisions of the Non-Compete Agreements. (*2014 RSU* at ¶ 9; *2015 RSU* at ¶ 9; *2016 RSU* at ¶ 8).

**E.   ABBISS'S EMPLOYMENT WITH FMC VIOLATES ABBISS'S NON-COMPETE AGREEMENTS.**

65. Despite these contractual obligations, on May 31, 2016, Abbiss left Cameron to work for FMC as its General Manager, Middle East, covering a region for which he had access to confidential information for Cameron.

66. Indeed, FMC has indicated that Abbiss will be working at least in the United Arab Emirates, Iran, Iraq, Kurdistan, Kuwait, and Qatar. Abbiss had access to Cameron's confidential information and trade secrets in all of these markets.

67. For example, as noted above, Abbiss was regularly briefed on upcoming tenders, financial information, marketing strategies, new product developments, and target customers/projects for Cameron across the Middle East in the months and weeks leading up to his resignation from Cameron in May 2016.

68. Abbiss is poised to immediately assist FMC in undercutting Cameron's business strategies and bids across the Middle East.

69. In light of the fact that Abbiss has gone to work for a direct competitor of Cameron in the same region where he had intimate access to and knowledge of Cameron's confidential information and business strategies, it is inevitable that Abbiss will use Cameron's confidential information in performing his job duties with FMC and breach his agreements with Cameron.

70. Indeed, it is hard to imagine how Abbiss could not be reasonably expected to draw on the confidential information he learned while at Cameron in performing such substantially similar duties in the same geographic market for FMC.

**F.    CAMERON HAS NO CHOICE BUT TO FILE SUIT AND PURSUE THIS INJUNCTIVE RELIEF.**

71. In June 2016, Cameron exchanged multiple letters with FMC and Abbiss expressing its concerns with Abbiss's employment with FMC.

72. Despite good faith attempts to resolve this dispute, FMC continues to employ Abbiss in a position which violates his Non-Compete Agreements and where it is inevitable that Abbiss will use or disclose Cameron's confidential information and trade secrets while working for FMC, causing Cameron to suffer irreparable harm from the loss of its trade secrets. As such, FMC and Abbiss have given Cameron no choice but to file this lawsuit and to seek injunctive relief.

## VI.
## CAUSE OF ACTION – BREACH OF CONTRACT

73. Cameron re-alleges, as if fully set forth herein, each allegation contained in the previous paragraphs.

74. The Non-Compete Agreements constitute valid and enforceable written contracts.

75. The Non-Compete Agreements are supported by sufficient consideration: the right to receive and actual receipt of substantial shares of Cameron stock, cash payments, and receipt of Cameron's confidential information. (*See 2014 RSU* at ¶¶ 1, 3, 5, 9-10; *2015 RSU* at ¶¶ 1, 3, 5, 9-10; *2016 RSU* at ¶¶ 1, 3-4, 8-9).

76. Cameron fully performed under the Non-Compete Agreements by giving Abbiss this consideration in exchange for Abbiss's promise not to compete against Cameron, solicit Cameron's employees or customers, or disclose or use Cameron's confidential information for a limited period of time after his employment ended. (*2014 RSU* at ¶ 9; *2015 RSU* at ¶ 9; *2016 RSU* at ¶ 8).

77. Through the actions described above, Abbiss breached the Non-Compete Agreements and, unless restrained, will continue to do so.

78. As a result of Abbiss's breach of the Non-Compete Agreements, Cameron has suffered monetary loss of business and market share, and will suffer irreparable harm from the loss of its confidential information and trade secrets.

79. As a consequence of Abbiss' breach, Cameron is entitled to recover from Abbiss the value of all shares of Cameron stock that has been paid to Abbiss under the RSUs, pursuant to the Non-Compete Agreements. (*2014 RSU* at ¶ 9; *2015 RSU* at ¶ 9; *2016 RSU* at ¶ 8).

80. As a further consequence of Abbiss's breach, Cameron has been required to retain the services of undersigned counsel. Cameron is entitled to all damages, reasonable attorneys'

fees, and court costs incurred in enforcing the Non-Compete Agreements in the prosecution of this matter and through all appeals, pursuant to the Non-Compete Agreements. (*2014 RSU* at ¶ 9; *2015 RSU* at ¶ 9; *2016 RSU* at ¶ 8).

81. Cameron is also entitled to reasonable attorneys' fees and court costs under Texas and Delaware law. TEX. CIV. PRAC. & REM. CODE ¶ 38.001 *et seq.*; *ATP Tour, Inc. v. Deutscher Tennis Bund*, 91 A.3d 554, 558 (Del. 2014) (noting while Delaware follows the American Rule, under which parties to litigation generally must pay their own attorneys' fees and costs, contracting parties may agree to modify the American Rule and obligate the losing party to pay the prevailing party's fees).

## VII.
## CAUSE OF ACTION – TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS

82. Cameron re-alleges, as if fully set forth herein, each allegation contained in the previous paragraphs.

83. Cameron had an ongoing contractual relationship with Abbiss through the Non-Compete Agreements.

84. FMC, with full knowledge of the contractual relationship between Abbiss and Cameron after Cameron advised FMC of its concerns in writing, continued to employ Abbiss in a position which violates the Non-Compete Agreements. As such, FMC is tortiously interfering with those agreements.

85. As a result of FMC's interference, Cameron has suffered and will continue to suffer actual loss and damages, including injury to goodwill, reputation, lost profits, loss of market share, and loss of future profits, and will further suffer immediate and irreparable injury from the loss of confidential information and trade secrets.

## VIII.
## JURY DEMAND

86.     Cameron requests a trial by jury on all issues triable by a jury in this case.

## IX.
## PRAYER

87.     Cameron respectfully requests that it be granted judgment for the following relief:

   a. Actual damages, including lost profits, loss of market share, loss of future profits, loss of credit reputation, and loss of goodwill;

   b. Recovery from Abbiss of the value of all stock awarded and paid under the RSUs;

   c. Pre- and post-judgment interest at the highest legal rate allowed by law;

   d. Attorneys' fees;

   e. Expert witness fees incurred by Cameron in the preparation and prosecution of this action;

   f. Costs of court, costs of prosecuting Cameron's claims;

   g. Injunctive relief, including temporary restraining order, preliminary injunction, and permanent injunction; and

   h. Such other and further relief to which Cameron may be entitled under the relevant statutes, law, or otherwise be justly entitled.

WHEREFORE, PREMISES CONSIDERED, Cameron respectfully prays that the Court issue a Temporary Restraining Order, and after hearing, the Court issue a Preliminary Injunction, and, after final trial, the Court issue a Permanent Injunction and award Cameron the relief requested above, and all such other further relief, whether at law or in equity, to which Cameron may show itself justly entitled.

Respectfully submitted,

**BAKER HOSTETLER LLP**

By:  */s/ Edward L. Friedman*
 Edward L. Friedman,
 *attorney-in-charge*
 State Bar No. 07462950
 Fed. ID No. 72833
 Cody T. Vasut, *of counsel*
 Texas Bar No. 24084012
 Fed. ID No. 1682835
 Kelline R. Linton, *of counsel*
 Texas Bar No. 24085436
 Fed. ID No. 2127346
 811 Main Street, Suite 1100
 Houston, Texas  77002-4995
 Telephone:  (713) 751-1600
 Facsimile:  (713) 751-1717
 Email:  efriedman@bakerlaw.com
 Email:  cvasut@bakerlaw.com
 Email:  klinton@bakerlaw.com

**ATTORNEYS FOR PLAINTIFF
CAMERON INTERNATIONAL CORPORATION**